UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

ES IT SOLUTIONS LLC d/b/a ZAELAB,     :

          Plaintiff/Counterclaim-     :     Case No. 1:19-cv-04896 (AJN)
          Defendant,

                          :     **ANSWER AND COUNTERCLAIM OF**
     -against-                   **THE DENTISTS SUPPLY COMPANY**

THE DENTISTS SUPPLY COMPANY,     :

          Defendant/Counterclaim-     :
          Plaintiff.

------------------------------------- X

Defendant/Counterclaim-Plaintiff The Dentists Supply Company ("<u>TDSC</u>"), by and through its undersigned attorneys McDermott Will & Emery LLP, brings this counterclaim against Plaintiff/Counterclaim-Defendant ES IT Solutions LLC d/b/a Zaelab ("<u>Zaelab</u>").  This counterclaim is based on TDSC's investigation to date, and TDSC reserves the right to amend this counterclaim as its investigation continues and there are further factual developments.  Based on knowledge as to itself and its own actions, and on information and belief as to all other matters, TDSC alleges as follows:

**INTRODUCTION**

1.     TDSC and Zaelab entered into an agreement whereby Zaelab promised, among other things, to code and configure an eCommerce website for TDSC.  Zaelab, however, failed to provide TDSC with what it bargained for because Zaelab failed to code and configure the eCommerce site according to industry standards and impaired the website's performance.

2.     To date, TDSC has paid hundreds of thousands of dollars to another organization – Deloitte Consulting LLP ("<u>Deloitte</u>") – to fix the bad coding done by Zaelab and ensure that

TDSC's eCommerce site actually functions to sell dental supplies to dentists in California and around the country.

3.     TDSC seeks damages in the amount that it has had to pay Deloitte to fix Zaelab's substandard coding and, to date, is approximately $350,000.

## PARTIES

4.     TDSC is a company organized under the laws of the State of California that sells dental supplies through its eCommerce website www.tdsc.com.  Its principal place of business is at 1201 K Street, 14th Floor, Sacramento, California 95814.

5.     On information and belief, Zaelab is a digital advisory and solutions company in the business of, among other things, providing eCommerce and website coding services to customers.  Its principal place of business is at 61 Wilton Road, Westport, CT 06880.

## JURISDICTION AND VENUE

6.     This Court has diversity subject matter jurisdiction under 28 U.S.C. § 1332. TDSC is a citizen of California because it is a California corporation with its principal place of business in California.

7.     On information and belief, Zaelab is a New York limited liability company consisting of a single member, who is a citizen of Connecticut.

8.     The matter in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

9.     This Court has personal jurisdiction over Zaelab because it agreed, by written contract, to submit to the exclusive jurisdiction of the state and federal courts located in New York.  (Agreement § 8.2.)

10.     Venue is also proper because Zaelab consented to personal jurisdiction to all federal and state courts located in New York and agreed to "waive any objections to [the state or federal courts located in New York] based on venue or the doctrine of forum non conveniens." (*Id.*)

## FACTUAL ALLEGATIONS

11.     The California Dental Association ("CDA") is an approximately 150 year old professional organization of dentists located in California and consists of approximately 27,000 members.  It is the single largest membership in the American Dental Association and is a trusted resource for California dentists and their patients.

12.     CDA supports dentists in all stages of their careers and offers its members a unique set of resources, including education, practice support, advocacy and protection.

13.     As part of fulfilling its mission to support California dentists, a group of CDA members came together and called on the CDA to assist them and their fellow dentists in staying competitive by leveraging their collective purchasing power to help keep dental supply costs down.  To that end, the CDA founded TDSC.

*TDSC Identifies Zaelab to Build TDSC's eCommerce Site*

14.     The most effective way for TDSC to fulfill its mission was to establish an eCommerce site to be used for the purchasing of dental supplies by the CDA membership and, eventually, dentists across the country.

15.     Without the internal capabilities to build an eCommerce website itself, TDSC put out a request for proposal ("RFP") to solicit bids from well-known and well-established vendors who specialized in this type of work.

16.     After receiving an initial set of bids in response to the RFP, SAP SE ("SAP") and its "Hybris" eCommerce platform was an early frontrunner to win the bid for the project.  TDSC requested that SAP, among others, come in to TDSC's offices to make a presentation as to the capabilities of the Hybris platform.

17.     During discussions with SAP prior to the presentation, SAP identified Zaelab as a "gold partner" and recommended that Zaelab perform the work called for by the RFP.  TDSC was told that Zaelab had experience in configuring and coding SAP's Hybris eCommerce platform to meet the needs of businesses like TDSC.

18.     At the initial meeting, Zaelab made the presentation and seemed to know exactly what TDSC was looking for in building the eCommerce site.  TDSC was told that the Hybris eCommerce platform provided an "out-of-the-box" solution that was flexible and scalable that would service the needs of TDSC as the business grew beyond just servicing the CDA membership.  TDSC was also informed that the Hybris platform was simple and cost-effective to manage.  Zaelab also seemed to be a perfect cultural fit with the TDSC team.

19.     By the time that the meeting had concluded, the TDSC team in charge of hiring the eCommerce vendor was convinced that Zaelab was the right fit to do the job.

20.     On September 14, 2016, TDSC and Zaelab executed a Professional Services Agreement (the "Agreement").  Under the Agreement, Zaelab agreed to perform a set of "Services", as detailed in accompanying Statements of Work ("SOW").  "SOW #1 describes the Services related to Zaelab's implementation of SAP Hybris ('Implementation Services'), and SOW #2 describes the Services related to Zaelab's hosting and support of SAP Hybris (collectively, the 'Hosting Services')."  (Agreement § 1.1.)

21.     In the Agreement, Zaelab represented and warranted that "the Services set forth in the Statements of Work shall be performed in a competent, professional, timely and workmanlike manner in accordance with industry standards by qualified individuals who have the skills necessary to perform the tasks described in the relevant Statement of Work . . . ." (Agreement § 6.2.1.)

22.     Although Zaelab impressed during the RFP process, it failed to complete the work required of it in accordance with the terms of the Agreement and the SOWs.

*Zaelab Codes and Configures the TDSC Website Using the Hybris Platform*

23.     Once Zaelab was hired, it began building and configuring TDSC's eCommerce site using the SAP Hybris platform and program.

24.     Although the website needed to be configured for TDSC's product catalog, approximately 80% of the website functionality was represented to TDSC as being "out-of-the-box".  This was important to TDSC as out-of-the-box functionality was key to TDSC's plan to get to market promptly.

25.     Zaelab understood how important the out-of-the-box functionality of Hybris was as the parties explicitly stated in SOW #1 that "Zaelab will seek to utilize native capabilities and favor configuration over customization of SAP hybris."  (SOW #1, § 8.a.)

26.     The TDSC eCommerce website first launched on February 10, 2017 at 10 a.m. but to a limited set of users.  The website was first made available to the TDSC board members and then the CDA board members, which together total approximately 60 members.

27.     The website performed for these small groups and, thus, the eCommerce website was made available to a founding member group of approximately 460 California dentists.

28.     Eventually, in June 2017, the TDSC eCommerce site was opened up to the entire CDA membership.

29.     By the time the rollout of the eCommerce site to the CDA membership was completed, the eCommerce site appeared to be working as intended.

30.     Zaelab certainly did not indicate that there were any issues or that it was doing any work in excess of any base hours of pay as defined in the Agreement or either of the parties' SOWs.

*In Light of the eCommerce Site's Successful Rollout, TDSC Decides to Take the Site National*

31.     In April of 2018, TDSC decided to take its eCommerce site national and expand its reach outside of California.  TDSC believed that the time to go national was right, in part, because of the successful rollout and performance of the eCommerce site (as of April 2018) as configured and coded by Zaelab.

32.     In May of 2018, TDSC and Zaelab had a meeting in which TDSC and Zaelab discussed the strategy and feasibility of taking TDSC's eCommerce site national.  TDSC's plans to take the website national were dependent upon Zaelab and its ability to successfully code and configure the Hybris platform for a national rollout (including more orders and larger orders).

33.     Zaelab was fully supportive of TDSC's strategy and did not identify any issues that would prevent TDSC from meeting its goal to take the site national.

34.     As the parties planned for a phased, nationwide launch, some issues with the website started to arise.  For example, the server space that was required for the site to run was too limited due to configuration issues implemented by Zaelab and needed to be fixed.  This process had to be completed in advance of the first phased launch.

35.     On November 3, 2018, TDSC launched its eCommerce site to an additional nine west coast states (the "West Coast Launch").  Although the launch was on-time, Zaelab did not deliver on much of the functionality that the parties agreed would be implemented on the site in advance of the West Coast Launch.

36.     For example, Zaelab did not complete the user-experience ("UX") enhancements that TDSC had requested.  Zaelab also failed to build in a subscription service so that new users could subscribe to a monthly purchase of certain frequently used and required dental supplies for their practices.  Zaelab also deferred building a number of other pieces of functionality in order to make the launch on time, such as building a cascading "mega menu", providing category facets for selling office supplies, adding new fields into "Redshift", and allowing customers to use email addresses that have more than three characters after the dot.

37.     Zaelab was simply falling behind on the projects that it was assigned to take the site national.

38.     After the West Coast Launch, TDSC's eCommerce website was opened to more users and more dentists and dental offices were trusting the site to deliver the dental supply needs for their practice and patients.

39.     The TDSC eCommerce site was also experiencing more problems and Zaelab's queue of "tickets" – i.e., requests to fix certain aspects of the eCommerce site – were piling up.

40.     Given the number of tickets piling up just to keep the site functional, Zaelab was no longer able to meet any of the deadlines that were set for some of the priorities that TDSC had set for the national launch of the website, including the UX upgrade that TDSC had requested.

41.     By the end of 2018, it was clear that TDSC needed to reassess whether Zaelab should be the party to complete the work needed by TDSC.  Accordingly, TDSC put out an RFP

to determine whether there were suitable alternatives and, after finding Deloitte in January of 2019, terminated the Agreement with Zaelab on or about February 6, 2019.

*Deloitte Is Hired by TDSC and Immediately Notices Problems with Zaelab's Coding*

42.     In January of 2019, TDSC reached an agreement with Deloitte to replace Zaelab as TDSC's vendor for the eCommerce site.  Deloitte was hired to do exactly the same thing as Zaelab, i.e., code and configure the eCommerce website as well as provide hosting services for the website.

43.     One of the persistent issues with the TDSC website that needed to be addressed by Deloitte was the cart and check-out function.  TDSC was receiving a number of complaints from its users that the check-out process took too long or that the website "froze" during check-out.  These issues did not arise in user testing and validation but manifested themselves as customers were making larger purchases (by number of items purchased).

44.     This issue was obviously of great concern to TDSC because the efficiency and success of the check-out process was the difference between a sale and a customer going elsewhere to purchase its dental supplies.

45.     Deloitte examined the code associated with the check-out process as coded and configured by Zaelab.  Deloitte determined that Zaelab had coded the tax calculation function in a manner inconsistent with industry practice.  The calculation of state and local tax for orders was a key piece of functionality and was defined in SOW #1 as a "must have" item for TDSC.

46.     Zaelab had coded the check-out process such that the website calculated the tax on each individual item – one-by-one – in a customer's cart when placing an order.  In small orders, this was not an issue.  If a customer purchased a dozen items, the website was able to do

a dozen tax calculations in pretty short order and the customer did not experience a significant (if any) delay.

47.    As dental practices became more familiar and comfortable with using the eCommerce website, order sizes grew.  As order sizes grew, the check-out process was taking longer and longer given the manner in which Zaelab coded it.

48.    As large orders were being placed, TDSC's customer service representatives were often fielding calls that the check-out process was broken or that it took an extremely long time. TDSC's customers were often getting a "spinning wheel" stuck on their web browsers while waiting for large order to go through.

49.    Deloitte was able to reconfigure and change the coding for the check-out process. Rather than the website running hundreds (or thousands) of tax calculations for a single order under the Zaelab code, Deloitte recoded the check-out so that the website only had to do two calculations:  first, subtotal the items in the customer's cart and, second, calculate the tax on the subtotal.

50.    Deloitte also investigated a number of other issues that TDSC's customers were experiencing when using the website.  For example, customers were experiencing problems when they tried to move a large number of items from their "saved list" – i.e., a list of frequently purchased items that customers saved –to the customer's cart.  Changes also needed to be made to the website's search functionality as well as the manner that the website was configured on the server so that all products available for sale would appear to the public (i.e., the "flip-flop server" issue).

51.    Much of Deloitte's early work on the TDSC eCommerce website was to fix these (and other) issues left by Zaelab's improper coding techniques that prevented the TDSC from

scaling to serve larger orders and larger customers (and, of course, more expensive and more lucrative orders and customers).

52.     To date, Deloitte estimates that approximately 30% of its time has been dedicated to fixing coding issues caused by Zaelab's substandard coding and other coding shortcuts taken by Zaelab's engineers.

53.     This work by Deloitte to remedy Zaelab's failures and breaches of the Agreement has cost TDSC approximately $350,000.  TDSC should not have had to incur these costs if Zaelab performed its Services "in a competent, professional, timely and workmanlike manner in accordance with industry standards by qualified individuals" as required by the Agreement.

## COUNT I
### (Breach of Contract)

54.     TDSC repeats and realleges the aforementioned allegations as if fully set forth herein.

55.     The Agreement is a valid and enforceable written contract.

56.     TDSC has performed all conditions, covenants, and terms required of it under the Agreement.

57.     Zaelab breached the Agreement for the reasons set forth above and on the evidence to be adduced and presented at trial or otherwise in this action.

58.     Further, Zaelab breached the Agreement by failing to perform the Services (as defined in the Agreement and as in the SOWs) "in a competent, professional, timely and workmanlike manner in accordance with industry standards by qualified individuals" as required by the Agreement.

59.     As a direct and proximate result of Zaelab's breaches, TDSC has been damaged in an amount to be determined at trial, but not less than $350,000.

60.     TDSC respectfully requests that this court enter judgment in its favor and against Zaelab, and for such other relief as the Court deems just and proper.

**WHEREFORE**, TDSC prays for relief and judgment as follows:

A.     Awarding damages in favor of TDSC in an amount to be determined at trial, but no less than $350,000, plus prejudgment interest at the statutory rate of 9% per annum;

B.     All costs and disbursements incurred in prosecuting this Counterclaim; and

C.     Such other and further relief as this Court deems just and proper.

\*       \*       \*

## ANSWER

Defendant/Counterclaim-Plaintiff TDSC, by and through its undersigned attorneys, hereby answer the Complaint of Plaintiff/Counterclaim-Defendant Zaelab, dated May 24, 2019 (the "Complaint").  The below responses to Zaelab's allegations are based upon the investigation conducted by TDSC to date and TDSC reserves the right to amend these responses as its investigation continues during the course of litigation.  Any allegation not expressly admitted is denied.  Based on knowledge as to itself and its actions, and on information and belief as to all other matters, TDSC states as follows:

1.     Denies the allegations as stated in paragraph 1 of the Complaint.

2.     Admits the allegations as stated in paragraph 2 of the Complaint, except states that it denies having sufficient knowledge or information to form a belief as to the truth of the allegation that Zaelab is a "New York limited liability company consisting of a single member, who is a citizen of Connecticut."

3.     Admits the allegations as stated in paragraph 3 of the Complaint.

4.     Admits the allegations as stated in paragraph 4 of the Complaint.

5.      Denies having sufficient knowledge or information to form a belief as to the truth of the allegations as stated in paragraph 5 of the Complaint.

6.      Admits the allegations as stated in paragraph 6 of the Complaint.

7.      Denies the allegations as stated in paragraph 7 of the Complaint, except admits that TDSC and Zaelab entered into the Agreement, dated September 14, 2016 to provide Services (as defined in the Agreement) pursuant to one or more Statements of Work ("SOW") and respectfully refers the Court to the Agreement and SOWs for a full recitation of their contents.

8.      Denies the allegations as stated in paragraph 8 of the Complaint and respectfully refers the Court to the Agreement and SOWs for a full recitation of their contents.

9.      Denies the allegations as stated in paragraph 9 of the Complaint, except admits that Zaelab did provide some services pursuant to the Agreement and SOWs.

10.     Admits the allegations as stated in paragraph 10 of the Complaint.

11.     Denies any allegation in paragraph 11 of the Complaint that TDSC owes all of the money requested by the invoices listed, except admits that Zaelab sent the invoices listed in paragraph 11 of the Complaint to Zaelab.

12.     Denies the allegations in paragraph 12 of the Complaint, except admits that TDSC paid Zaelab $485,799.69 and withheld further payment because, among other reasons, Zaelab failed to provided adequate proof and documentation for the purported hours worked.

13.     Denies the allegations in paragraph 13 of the Complaint.

14.     Denies the allegations in paragraph 14 of the Complaint.

15.     Admits the allegations in paragraph 15 of the Complaint.

16.     Denies the allegations in paragraph 16 of the Complaint.

17.     Denies the allegations in paragraph 17 of the Complaint.

18.     Denies the allegations in paragraph 18 of the Complaint.

TDSC denies that Zaelab is entitled to any of the relief it seeks as enumerated in its Demand for Relief.

## **AFFIRMATIVE DEFENSES**

Without assuming the burden of proof on any matters where that burden rests on Zaelab, TDSC, based on knowledge as to itself and its own acts and on information and belief as to all other matters, asserts the following affirmative and other defenses with respect to the Complaint:

### **First Affirmative Defense**

Zaelab's cause of action is barred, in whole or in part, for failure to state a claim on which relief may be granted.

### **Second Affirmative Defense**

Zaelab's cause of action is barred, in whole or in part, by its own breaches of the Agreement, including but not limited to, its failure to perform the Services as warranted under Section 6.2.1 of the Agreement and its failure timely to invoice TDSC as required by Section 2.3 of the Agreement.

### **Third Affirmative Defense**

Zaelab's cause of action is barred, in whole or in part, by the doctrine of estoppel.

### **Fourth Affirmative Defense**

Zaelab's cause of action is barred, in whole or in part, by the doctrine of laches.

### **Fifth Affirmative Defense**

Zaelab's cause of action is barred, in whole or in part, by the doctrine of waiver.

### **Sixth Affirmative Defense**

Zaelab's cause of action is barred, in whole or in part, by the doctrine of unclean hands.

## Seventh Affirmative Defense

Zaelab's cause of action is barred, in whole or in part, by the doctrine of set-off.

## Eighth Affirmative Defense

PIP's causes of action are barred, in whole or in part, by failing to mitigate its damages.

Dated: September 13, 2019                              Respectfully submitted,


By: */s/ Michael R. Huttenlocher*
     Michael R. Huttenlocher
     MCDERMOTT WILL & EMERY LLP
     340 Madison Avenue
     New York, New York 10173
     Telephone:  (212) 547-5400
     Email:  mhuttenlocher@mwe.com

     *Attorneys for Defendant*
     *The Dentists Supply Company*